## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANA MARIA MERCALDO NAZARIO,** | : | **Civil No. 1:21-CV-862** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.     Introduction

On April 15, 2019, Ana Nazario applied for disability insurance benefits, alleging an onset of disability beginning June 30, 2017. (Tr. 21). According to Nazario she was disabled due to emotional impairments, including anxiety, depression, and panic attacks. Other than allergies and sinusitis, Nazario did not identify any disabling medical impairments. (Tr. 187, 211). With respect to these conditions, the clinical record documenting Nazario's treatment, while at times equivocal, contained numerous unremarkable entries and generally documented mild to moderate impairments. Presented with this clinical record, and this diversity of opinion evidence, the Administrative Law Judge (ALJ) assigned to this case found that Nazario could work at a variety of exertional levels, provided that she was

1

afforded some accommodations for her emotional impairments and denied her claim. (Tr. 25-29). Nazario now appeals this decision, arguing that the ALJ's decision was not supported by substantial evidence. In particular, Nazario contends that the ALJ erred in the evaluation of the opinion of a medical consultant who examined the plaintiff on one occasion and failed to adequately account for some of her physical impairments.

In considering this decision, we have been instructed by the Supreme Court to exercise a limited scope of substantive review when considering Social Security appeals. Our task is to determine whether substantial evidence supports the ALJ's decision, and we are enjoined that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In this case, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's disability determination. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.    **Statement of Facts and of the Case**

On April 15, 2019, Ana Nazario applied for applied for disability insurance benefits, alleging an onset of disability beginning June 30, 2017. (Tr. 21). According to Nazario she was disabled due to emotional impairments, including anxiety, depression, and panic attacks. Notably, other than allergies and sinusitis, Nazario did not identify any disabling medical impairments. (Tr. 187, 211).  Nazario was born in 1961 and was approximately 56 years old at the time of the alleged onset of her disability. (Tr. 64). She had prior employment as a hand packager from 2003 through 2017. (Tr. 30).

With respect to Nazario's emotional impairments, her presenting disabling concern, physical impairments, the medical record confirmed that the plaintiff experienced some degree of impairment due to anxiety and depression. However, these treatment records were very mixed in terms of the severity of these conditions,

3

and substantial treatment records described Nazario's impairments in terms that were not wholly disabling.

This treatment history was thoroughly summarized by the ALJ in the decision denying Nazario's claim for benefits where the ALJ explained that:

> Mental health records in June 2017 note anxiety, the claimant was in therapy one day a week, and the claimant reported that she worried a lot. She was discharged from therapy in September 2017 and had only attended two sessions. Her therapist left the agency and the claimant did not want to transfer to a different clinic, which had a bilingual therapist. Her aftercare plan was to call this provider (PCS) if symptoms occurred, and no referrals were made to any providers or agencies. It was recommended that she maintain all regular appointments as recommended by her physician (Exhibit 11F/14-23). These findings along with the modest aftercare recommendations do not indicate an individual with substantial mental health issues.
>
> The claimant resumed mental health therapy in July 2018, reporting that past treatment had helped and she was optimistic in returning to treatment. Therapy records between July 2018 and September 2018 indicate the claimant is cooperative and receptive to treatment. She had not taken medications in over a year and the claimant reported that medications helped her feel calmer and less anxious. She denied having any recent panic attacks during 2 office visits in September 2018 and reported an overall peaceful feeling on September 20, 2018. However, she had some fear provoking dreams (Exhibit 4F/60-89, 7F/73).
>
> The claimant resumed care with a psychiatrist in October 2018, and she was not taking any mental health medications at that time. Although tearful and dysphoric with a depressed mood when examined, she showed good insight and judgment, intact memory and decision making capacity, good eye contact, a cooperative attitude, an appropriate manner, intact reality testing, and she was able to complete testing that dealt with registration recall, attention, and concentration (Exhibit 4F/114-115). Additionally, despite anxiety, the claimant reported to her

4

therapist that overall, her anxiety was manageable (Exhibit 4F/56) and she was walking at the mall (Exhibit 7F/53) so she was clearly able to leave her home and be around other people. She continued to deny panic attacks on November 1, 2018 (Exhibit 7F/51). When examined on November 28, 2018, the claimant continued to have a depressed mood. However, she also continued to show good insight and judgment, intact decision making and reality testing and she was able to complete testing that dealt with registration recall, attention, and concentration (Exhibit 4F/111-112). Additionally, the claimant considered making extra income with homemade Christmas dishes (Exhibit 7F/45) but she testified she is too afraid to cook.

By December 26, 2018, the claimant was noted as improved subjectively. Similarly, her mental status examination showed a calm mood, which was an improvement from a depressed mood in October and November 2018. Subsequent treatment records from Exhibit 4F also document a calm mood. Returning to December 26, 2018, she was neat with a mild level of distress, normal concentration, a circumstantial thought association, a blunted affect, good insight and judgment, intact decision making and reality testing, and she was able to complete testing that dealt with registration recall, attention, and concentration. She was not tearful during this office visit (Exhibit 4F/107-109).

She continued to have a calm mood in January 2019 and was again noted as being improved. The claimant reported that she felt more calm, her family is doing well, and she has been enjoying her grandchildren. When examined, she was neat, with a mild level of distress, normal concentration, a circumstantial thought association but logical thought process, a blunted affect, normal speech, good insight and judgment, intact recent and remote memory, decision making capacity, and reality testing, and she was able to complete testing that dealt with registration recall, attention, and concentration (Exhibit 4F/104-106).

Records from March 2019 indicate the claimant has improved and the claimant reported that she still felt good. The claimant reported she still has anxiety when she goes out and she only goes out when she has to. Mental status examination findings indicate a neat appearance, a mild level of distress, normal concentration, a circumstantial thought

5

association, a logical thought process, a blunted affect, a neat appearance, normal speech, good insight and judgment, intact recent and remote memory, decision making capacity, and reality testing, and she was able to complete testing that dealt with registration recall, attention, and concentration. Since the claimant reported she had hallucinations when trying to fall asleep, her psychiatrist noted hallucinations in this report (Exhibit 4F/102-103).

In April 2019, the claimant reported that Diazepam was relaxing her, she planned to travel to Connecticut to get her grandchildren, who would be staying with her one week; this shows she functioned well enough to travel and she functioned well enough to watch or at least help watch and interact with her grandchildren. The claimant's psychiatrist advised the claimant has had a partial response to treatment. The claimant has been sleeping better than she had been although she still woke up early. The claimant reported irritability, changes in energy, panic attacks, anxiety, difficulty stating awake, and anhedonia. Although considered, her mental status examination showed a neat appearance, a mild level of distress, normal concentration, a circumstantial thought association but logical thought process, a blunted affect, a calm mood, good insight and judgment, intact decision making, intact reality testing, good eye contact, a cooperative mood, and an appropriate manner (Exhibit 4F/ 97-98). Therapy records indicate that the claimant appeared mentally and emotionally stable (Exhibit 4F/20).

When examined in May 2019, the claimant had a calm mood, only a mild level of distress, a logical thought process, and normal speech. She had a circumstantial thought association, a blunted affect, a calm mood, good insight and judgment, intact recent and remote memory, a cooperative attitude, and she was able to complete tasks pertaining to registration recall, attention, and concentration (Exhibit 4F/94-95). The claimant reported manageable worry stress, and anxiety related to her daily responsibilities. Therapy records note mild anxiety, which is consistent with her psychiatrist's report of a calm mood and only a mild level of distress (Exhibit 4F/18).

6

Records from July 2019 indicate a neat appearance, a mild level of distress, normal concentration, circumstantial thought associations, a logical thought process, a blunted affect, normal speech, a calm mood, reported hallucinations, good insight and judgment, a cooperative attitude, intact decision making, intact reality testing, full registration recall, and she was able to complete serial sevens and spell work backwards; these were used to test the claimant's attention and concentration (Exhibits 4F pp. 91-92 and 6F/8-9). Therapy records indicate continued but diminishing anxiety and the claimant has gone out on outings with her family and she has gone to the grocery store by herself. The claimant appeared positive in affect and attitude and was noting as making moderate progress since her last therapy session. Records from August 2019 indicate she went shopping by herself at the Hershey Outlets, which is an outlet mall a couple of towns away from her residence (Exhibit 4F/1-4, 7F/1).

Records from August 2019 indicate a partial response to treatment, the claimant felt more calm, and her mental status examination showed a neat appearance, a mild level of distress, normal concentration, circumstantial thought associations, a logical thought process, an appropriate affect, normal speech, a calm mood, reported hallucinations, good insight and judgment, a cooperative attitude, intact decision making, intact reality testing, full registration recall, and she was able to complete serial sevens and spell work backwards; these tests were used to test the claimant's attention and concentration (Exhibit 6F/2-3).

Records from November 2019 indicate that the claimant has been feeling good for the last few weeks. Although she felt more depressed in October 2019, she reported that she was doing better in November 2019. Objective findings in November 2019 were similar to August 2019 other than she had no impairment regarding thought content, which was an improvement from August 2019 where hallucinations were noted (Exhibits 6F/2-3 and 11F/8). Turning to hallucinations, treatment records indicate these generally occur at night before and while sleeping. Although they are among the reasons she receives treatment, treatment records do not suggest hallucinations have a substantial impact on her ability to accurately perceive things or people

7

while she is awake, including in any work settings (Exhibits 4F, 6F, and 11F).

Records from February 2020 indicate the same findings as those in August 2019, including that the claimant had a calm mood, good insight and judgment, intact recent and remote memory, decision making, and reality testing, and she could complete tests that tested her attention, concentration, and registration recall (Exhibit 11F/11-12). Records from May 2020 indicate some anxiety, she was looking forward to going back to church, and similar findings to those from February 2020 (Exhibit 11F/7-8). In June 2020, the claimant verbalized increased mental calmness and she appeared willing to continue to challenge her fears by reflecting on realistic expectations about her healing process. She was noted as making moderate progress since her last therapy session (Exhibit 11F/28).

Records from July 2020 indicate increasing anxiety and the claimant reported calming benefits related to her spiritual practices to help her with anxiety. Despite the claimant's report of increasing anxiety, she was noted as making moderate progress (Exhibit 11F/27). Additionally, therapy records in 2020 overall indicate that the claimant has shown a continued ability to remain calm (Exhibit 11F). The claimant testified that she lives with her daughter and children. She testified she has a driver's license and she is able to drive.

(Tr. 26-29).

Cast against this clinical history, three medical experts opined regarding the severity of Nazario's emotional impairments. At the outset, on August 15, 2019, a state agency expert, Dr. John Gavazzi, found based upon a medical record review that Nazario was moderately impaired in carrying out detailed instruction, but could follow simple instructions. (Tr. 71). Dr. Gavazzi also found that Nazario experienced moderate impairments interacting with the public and accepting criticism from

8

supervisors, as well as responding to changes in the work setting, but concluded that she was not significantly impaired in other realms of functioning. (Tr. 72). Based upon these findings, Dr. Gavazzi opined that Nazario was not disabled due to her emotional impairments. (Tr. 74). A second state agency expert review undertaken by Dr. Francis Murphy on April 10, 2020, reached similar conclusions based upon a review of the entire medical record. (Tr. 77-88). In contrast, Dr. Sarah Springer, who conducted a consultative examination of Nazario on July 26, 2019, concluded that she suffered from marked impairments in her ability to interact with others and respond to workplace changes. (Tr. 413-19).

It was against the backdrop of this contrasting evidence, much of which indicated that Nazario retained the emotional capability to do some work, that an ALJ conducted a disability hearing in this case on September 22, 2020. (Tr. 39-63). The focus of this hearing was on Nazario's psychological impairments, although there was brief mention of an outstanding request for information concerning records of an examination of Nazario's right hand. (Tr. 44-45). At that time Nazario's counsel agreed that it was not necessary for the ALJ to keep the administrative record open to receive these examination results, (Tr.45), and in fact these records were not before the ALJ when he rendered his decision. (Tr. 35-36). Instead, the ALJ took

testimony from Nazario, who described the severity of her emotional impairments, (Tr. 50-54), and also received testimony from a vocational expert.

Following this hearing, on October 9, 2020, the ALJ entered a decision denying Nazario's application for benefits. (Tr. 15-30). In this decision, the ALJ first concluded that Nazario met the insured status requirements of the Act through December 31, 2021. (Tr. 23). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Nazario had the following severe impairments: a major depressive disorder, a generalized anxiety disorder, an obsessive-compulsive disorder, post-traumatic stress disorder, and insomnia due to a mental disorder. (Id.) These were the sole impairments identified by Nazario in her disability application. (Tr. 187, 211).

While Nazario had not identified it as a disabling impairment the ALJ also considered a physical condition she experienced, endometrioid adenocarcinoma, in this disability assessment, finding as follows:

> Treatment records from July 2020 indicate FIGO grade 1, stage 1A endometriod adenocarcinoma. This was definitively managed through a hysterectomy and related surgical procedures on May 28, 2020 (Exhibit 10F). The claimant told her mental health providers on June 15, 2020 that all cancer had been removed via surgery and no additional procedures were necessary at that time (Exhibit 11F/30). Additionally, her ECOG performance status in late July 2020 was 0. As such, this is a non severe impairment. The record did not indicate much in the way of work related limitations prior to her surgery, surgery looks to have resolved cancer, and she did not testify about any cancer recurrence. As

10

such, the record does not show this impairment caused work related limitations for any period of at least 12 continuous months.

(Tr. 23-24).

At Step 3, the ALJ determined that Nazario did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 24-25). Between Steps 3 and 4, the ALJ fashioned this following residual functional capacity ("RFC"), assessment for Nazario:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can apply a commonsense understanding to carry out detailed, but uninvolved written or oral instructions. She can deal with problems involving a few concrete variables on or from standardized situations. The claimant can make judgments on detailed, but uninvolved written or oral instructions. She can occasionally interact with coworkers, supervisors and the public in a routine work setting.

(Tr. 25).

In making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Nazario's testimony regarding her impairments. On this score, the ALJ carefully detailed Nazario's clinical history which did not disclose disabling emotional impairments. (Tr. 16-29).

The ALJ's evaluation also took into account the medical opinion evidence. (Tr. 29-30). On this score, the ALJ found the opinions of the two state agency experts

11

to be generally persuasive in that they were generally consistent with the medical evidence of record. (Tr. 29). The ALJ largely discounted Dr. Springer's opinion, stating that:

> Dr. Springer's opinions from July 26, 2019 at Exhibit 5F are not persuasive. Dr. Springer did not support why she found the claimant so limited. Although the claimant had a labile and depressed affect, otherwise, the claimant was cooperative when they met and the claimant had an adequate manner of relating. There was no evidence of hallucinations when they met and the claimant was well groomed with normal motor behavior and appropriate eye contact. Despite these findings, Dr. Springer found the claimant had marked limitations in her ability to interact with others, respond appropriately to usual work situations and to changes in a routine work setting (Exhibit 5F). Her opinions are inconsistent with the opinions of both state agency consultants and with the claimant's treatment records, including records that show the claimant is responding to treatment, she had a calm mood during several office visits, and she is cooperative with her mental health providers with good insight, judgment, and decision making capacity (Exhibits 1A, 4A, 4F-6F, and 11F).

(Tr. 30).

Having arrived at this RFC assessment, the ALJ found at Step 4 that Nazario could return to her past work as a hand packager. (Tr. 30). Accordingly, the ALJ concluded that Nazario did not meet the stringent standard for disability set by the Act and denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Nazario contends that the ALJ's decision was not supported by substantial evidence. In particular, Nazario argues that the ALJ erred in the evaluation of the opinion of a medical consultant who

examined the plaintiff on one occasion, erred in reaching this RFC determination, and failed to adequately account for some of her physical impairments.  This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  <u>Discussion</u>

### A.  <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be

13

"something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

14

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial

review. Simply put, "this Court requires the ALJ to set forth the reasons for his

decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000).

As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "Burnett does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim

made here, based upon alleged inadequacies in the articulation of a claimant's

mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that

apply in this setting. In Hess the court of appeals considered the question of whether

an RFC which limited a claimant to simple tasks adequately addressed moderate

16

limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess, 931 F.3d at 211. On this score, the appellate court indicated that an ALJ offers a valid explanation on a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Id. at 214.

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

17

**B.**    <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant

18

is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013)

(quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such

as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience, and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

### C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The plaintiff filed this disability application in April of 2019 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of

2017, the Commissioner's regulations governing medical opinions changed in a

number of fundamental ways. The range of opinions that ALJs were enjoined to

consider were broadened substantially, and the approach to evaluating opinions was

changed from a hierarchical form of review to a more holistic analysis. As one court

has aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." <u>Revisions to Rules
> Regarding the Evaluation of Medical Evidence</u> ("<u>Revisions to Rules</u>"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u>
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." <u>Id.</u> at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the
> foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg.
> 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered
> the supportability and consistency factors" for a medical opinion. 20
> C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to

"supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

By way of further guidance, while these regulations eschew any hierarchical

ranking of opinions, they call upon ALJ's to evaluate medical opinions against the

following benchmarks:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section.

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

(iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

(v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c.

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-

established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Likewise, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

Simply put, while:

> [T]he analytical paradigm that applies to evaluating medical opinions fundamentally changed in March of 2017, . . . that change does not alter the significance of medical opinion evidence to a disability analysis. Nor does that paradigm shift discount the longstanding legal principles which called for a clear articulation of the ALJ's rationale in making a disability determination.

<u>Kenyon v. Saul</u>, No. 1:20-CV-1372, 2021 WL 2015067, at *9 (M.D. Pa. May 19, 2021).

### D.   <u>The ALJ's Decision is Supported by Substantial Evidence.</u>

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce</u>, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Nazario was not disabled. Therefore, we will affirm this decision.

With respect to her claims regarding the treatment of the medical opinion evidence, we first note that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

In the instant case, the plaintiff argues that the ALJ should have found Dr. Springer's opinion more persuasive, and that the ALJ erred in finding the opinions of the state agency consultants persuasive. However, we conclude that the ALJ properly discussed all of the relevant evidence in determining the persuasive power of this opinion. First, with respect to Dr. Springer's opinion, the ALJ explained that while the record supported some of Dr. Springer's limitations, the more severe limitations found by the doctor were inconsistent with Nazario's treatment records.

It is axiomatic that, when evaluating medical opinion evidence an ALJ typically may discount a medical opinion when it conflicts with other objective tests

28

or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between a medical source's opinion, and the claimant's actual treatment notes, justifies a finding that a medical source's opinion lacks persuasive power. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). In this case, the ALJ found that Dr. Springer's highly restrictive opinion was inconsistent with treatment records. This finding, which draws support from substantial evidence in the record, undermined both the supportability and consistency of Dr. Springer's opinion. Since under the current governing regulations supportability and consistency are the keystones for persuasiveness of a medical opinion, the ALJ did not err in affording this opinion less persuasive power than the state agency expert opinions which were, on the whole, more consistent, and congruent with the clinical evidence.

We conclude that substantial evidence supports the ALJ's treatment of this medical opinion evidence. Thus, the ALJ was presented with several medical opinions. Ultimately, the ALJ discussed the weight afforded to each, citing to the objective medical evidence that supported or undermined the opinions. This is the task of the ALJ, and it is "[t]he ALJ – not treating or examining physicians or State agency consultants–[who] must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Accordingly, we find that the ALJ

29

considered all of the medical evidence and adequately explained his reasoning for the weight given to the various medical opinions in this case to determine the range of work Nazario could perform.

Further, this argument fails when it is viewed through the pragmatic analytical lens prescribed by the Court of Appeals in Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019). In Hess the court addressed the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In terms that are equally applicable here the court noted that: "The relationship between 'simple tasks' limitations and 'concentration, persistence, or pace' is a close one." Id. Given how closely related these two concepts are, the appellate court rejected the notion advanced by the plaintiff that an RFC which limited a claimant to simple tasks failed as a matter of law to address moderate limitations on concentration, persistence, and pace. Instead, the court concluded that:

> A limitation to "simple tasks" is fundamentally the same as one "to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions[.]" (App. at 33-34;) see Davis v. Berryhill, 743 F. App'x 846, 850 (9th Cir. 2018) (treating "understanding, remembering, and carrying out only simple instructions" as equivalent to "simple tasks"); Richards v. Colvin, 640 F. App'x 786, 790 (10th Cir. 2016) (referring to a limitation "to understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions" as a "simple-work limitation[ ]"). Indeed, both formulations — the ALJ's and the more

30

concise phrase "simple tasks" — relate to mental abilities necessary to perform "unskilled work." See 20 C.F.R. §§ 404.1568(a), 416.968(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."); SSR 96-9P, 1996 WL 374185, at *9 (July 2, 1996) (concluding that "unskilled work" requires "[u]nderstanding, remembering, and carrying out simple instructions" and "[m]aking ... simple work-related decisions"); cf. Richards, 640 F. App'x at 790 (treating "simple-work limitations" as similar to "unskilled work" limitations). So the parties' reliance on case law related to "simple tasks" is appropriate and helpful.

Hess v. Comm'r Soc. Sec., 931 F.3d 198, 210–11 (3d Cir. 2019).

Having rejected a *per se* rule finding that simple task RFCs are legally inadequate to address moderate limitations in concentration, persistence, and pace, the court of appeals found that in this setting, the issue was one of adequate articulation of the ALJ's rationale, holding that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation for a simple task RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, which demonstrated that [s]he is capable of engaging in a diverse array of 'simple tasks[.]' " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, <u>Hess</u> controls here and enjoins us to address Nazario's ability to undertake the mental demands of the workplace in the specific factual context of this case. Further, applying this fact-bound approach, we are instructed that a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence. Here, the ALJ provided a valid explanation for this RFC, which allowed Nazario to:

> apply a commonsense understanding to carry out detailed, but uninvolved written or oral instructions. She can deal with problems involving a few concrete variables on or from standardized situations. The claimant can make judgments on detailed, but uninvolved written or oral instructions. She can occasionally interact with coworkers, supervisors and the public in a routine work setting.

(Tr. 25).

The restrictions imposed by the ALJ were consistent with the ALJ's carefully detailed factual findings which indicated that, with some accommodation, Nazario was able to meet the intellectual and emotional demands of the workplace.

Finally, we find no error in the ALJ's treatment or consideration of Nazario's wrist pain or endometrioid adenocarcinoma. At the outset, we note that neither of these conditions was identified by Nazario as a disabling impairment. (Tr. 187, 211). Nonetheless the ALJ did consider her endometrioid adenocarcinoma as part of the Step 2 analysis in this case and found that the evidence did not support a finding that this medical condition was a severe impairment. Our consideration of this claim is guided by familiar legal principles. Initially:

> At step-two of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). An impairment is severe if it is "something beyond a 'slight abnormality which would have no more than a minimal effect on the Plaintiff's ability to do basic work activities. <u>McCrea v. Comm'r of Soc. Sec.</u>, 370 F.3d at 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the step-two inquiry is a de minimis screening device used to cast out meritless claims. <u>McCrea</u>, 370 F.3d at 360; <u>Newell v. Comm'r of Soc. Sec.</u>, 347 F.3d 541, 546 (3d Cir. 2003). The burden is on the claimant to show that an impairment qualifies as severe. <u>Bowen</u>, 482 U.S. at 146, 107 S.Ct. 2287.

<u>Stancavage v. Saul</u>, 469 F. Supp. 3d 311, 331 (M.D. Pa. 2020).

Further:

> [I]t is well-settled that: "[E]ven if an ALJ erroneously determines at step two that one impairment is not 'severe,' the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five." <u>Naomi Rodriguez v. Berryhill</u>, No. 1:18-CV-684, 2019 WL 2296582, at *10 (M.D. Pa. May 30, 2019)(citing cases).

<u>Id.</u> at 332.

In this case, the ALJ's finding that Nazario's adenocarcinoma was not a severe condition was supported by substantial evidence since the ALJ aptly noted: "The record did not indicate much in the way of work related limitations prior to her surgery, surgery looks to have resolved cancer, and she did not testify about any cancer recurrence." (Tr. 23-24). There was no error here.

Finally, with respect to Nazario's argument that the ALJ erred in failing to take into account her wrist pain, the simple answer to this claim is that the evidence of this hand pain was not before the ALJ at the time of this decision and at the hearing in her case Nazario's counsel agreed that it was not necessary for the ALJ to keep the administrative record open to receive this evidence. (Tr. 45). Given these immutable facts a remand of this case based upon this evidence could only be justified under 42 U.S.C. § 405(g). As we have noted in the past, under §405(g):

> "The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." In exercising this authority, the United States Court of Appeals for the Third Circuit has emphasized that a claimant seeking remand on the basis of new evidence must demonstrate that the additional evidence is both new and material, and that the claimant had good cause for not submitting the evidence to the ALJ for his initial review. Szubak v. Sec'y of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Where such criteria are met, the district court may enter what is colloquially referred to as a "sentence six" remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).

> In order for a claimant to prevail on a request for a sentence six remand, the evidence to be considered must first truly be "new evidence" and "not merely cumulative of what is already in the record." Szubak, 745 F.2d at 833. Second, the evidence must be "material," meaning that it must be "relevant and probative." Id. In making this determination,

>> the materiality standard of § 405(g) requires "that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." Id.

34

> See also Booz v. Secretary of Health and Human Services, 734 F.2d 1378, 1381 (9th Cir. 1984); Dorsey v. Heckler, 702 F.2d 597, 604–05 (5th Cir. 1983); Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981). Thus, to secure remand, a claimant must show that new evidence raises a "reasonable possibility" of reversal sufficient to undermine confidence in the prior decision. The burden of such a showing is not great. A "reasonable possibility," while requiring more than a minimal showing, need not meet a preponderance test. Instead, it is adequate if the new evidence is material and there is a reasonable possibility that it is sufficient to warrant a different outcome.

Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985). Further, "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied...." Szubak, 745 F.2d at 833 (citing Ward v. Schweiker, 686 F.2d 762, 765 (9th Cir. 1982)).

In practice,

> [f]our factors must be considered pursuant to this requirement. See, e.g., Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985). First, the evidence must be new and not merely cumulative of what is already in the record. Id. at 287. Second, the evidence must be material, relevant and probative. Id. Third, there must exist a reasonable probability that the new evidence would have caused the Commissioner to reach a different conclusion. Id. Fourth, the claimant must show good cause as to why the evidence was not incorporated into the earlier administrative record. Id.

Scatorchia v. Comm'r of Soc. Sec., 137 Fed.Appx. 468, 472 (3d Cir. 2005).

Passaretti v. Berryhill, No. 4:17-CV-1674, 2018 WL 3361058, at *10–11 (M.D. Pa.

July 10, 2018).

This is clearly an exacting burden of proof, and we find that Nazario has not met these precise and compelling standards for a remand of her case based upon some late discovered evidence. While that evidence discloses some hand impairment, these conditions are described as mild to moderate, (Tr. 35, 36), and it cannot be said this additional evidence created a reasonable probability that the Commissioner would have reached a different conclusion. Therefore, § 405(g)'s materiality standard simply is not met here.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

36

## IV.   <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: August 17, 2023

37